# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Food & Water Watch,<br>    Petitioner | : | |
| | : | |
| v. | : | No. 565 C.D. 2020 |
| | : | |
| Department of Environmental<br>Protection,<br>    Respondent | : | |
| | : | |
| | : | |
| Commonwealth of Pennsylvania,<br>Department of Environmental<br>Protection,<br>    Petitioner | : | |
| | : | |
| v. | : | No. 621 C.D. 2020 |
| | : | |
| Food & Water Watch,<br>    Respondent | : | |
| | : | |
| Keystone Protein Company,<br>    Petitioner | : | |
| | : | |
| v. | : | No. 627 C.D. 2020 |
| | : | |
| Food & Water Watch,<br>    Respondent | : | ARGUED: March 15, 2021 |

BEFORE: HONORABLE PATRICIA A. McCULLOUGH, Judge
     HONORABLE ELLEN CEISLER, Judge
     HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE CEISLER          FILED: April 12, 2021

In these consolidated appeals, Food and Water Watch (FWW) petitions for review of the May 21, 2020 Adjudication of the Environmental Hearing Board (Board), which dismissed FWW's appeal from the Commonwealth of Pennsylvania,

Department of Environmental Protection's (DEP) issuance of a national pollutant discharge elimination system permit (Permit) to Keystone Protein Company (Keystone). Both DEP and Keystone have filed Cross Petitions for Review from the Board's Adjudication, in which they challenge only the Board's determination that FWW had standing to appeal DEP's issuance of the Permit. For the reasons that follow, we affirm the Board's Adjudication.

## Background

FWW is a national nonprofit organization that advocates for clean water and public control of water resources, including oceans, rivers, and groundwater, on behalf of its members. Keystone operates a poultry processing and rendering plant in Bethel Township, Lebanon County.

DEP is the state agency with the authority to administer and enforce the provisions of The Clean Streams Law, Act of June 22, 1937, P.L. 1987, *as amended*, 35 P.S. §§ 691.1-691.1001. DEP is also responsible for implementing and administering the National Pollutant Discharge Elimination System (NPDES) program in Pennsylvania pursuant to Section 402(b) of the Clean Water Act, 33 U.S.C. § 1342(b).[1]

---

[1] Section 402(b) of the Clean Water Act provides, in pertinent part:

[T]he Governor of each State desiring to administer its own [NPDES] permit program for discharges into navigable waters within its jurisdiction may submit to the Administrator [of the United States Environmental Protection Agency (EPA)] a full and complete description of the program it proposes to establish and administer under State law or under an interstate compact. In addition, such State shall submit a statement from the attorney general (or the attorney for those State water pollution control agencies which have independent legal counsel), or from the chief legal officer in the case of an interstate agency, that the laws of such State, or the interstate compact, as the case may be, provide adequate authority to carry out the described [NPDES] program.

Portions of Pennsylvania are located within the Chesapeake Bay Watershed, including the Susquehanna River Basin. Each basin within the Chesapeake Bay jurisdictions was assigned a specific allocation of nitrogen, phosphorus, and sediment. In 2010, DEP adopted a nutrient credit trading program to assist Pennsylvania in meeting the Chesapeake Bay total maximum daily load (TMDL) for pollutants. TMDL is the maximum amount of a pollutant that a specific body of water can receive from all sources and still attain its designated water quality criteria.[2] DEP's regulations provide, in pertinent part:

> (b) *Chesapeake Bay water quality.*
>
> (1) Credits and offsets[3] may be used to meet legal requirements for restoration, protection and maintenance of the water quality of the Chesapeake Bay.
>
> (2) Credits may be generated only from a pollutant reduction activity that has been certified, verified and registered under this section.
>
> (3) Credits and offsets may be used by permittees to meet effluent limits for nitrogen, phosphorus and sediment expressed as annual loads in pounds contained in NPDES permits that are based on compliance with water quality standards established under the

---

33 U.S.C. § 1342(b).

[2] TMDL is a mechanism for reducing pollution in waterways that do not meet water quality standards. Reproduced Record (R.R.) at 465a. As the Board explained, "when a body of water is impaired for one or more pollutants, a . . . TMDL must be developed." *Id.*

[3] The regulations define a "credit" as "[t]he tradable unit of compliance that corresponds with a unit of reduction of a pollutant as recognized by [DEP] which, when certified, verified and registered, may be used to comply with NPDES permit effluent limitations." 25 Pa. Code § 96.8(a). An "offset" is defined as "[t]he pollutant load reduction measured in pounds that is created by an action, activity or technology which[,] when approved by [DEP,] may be used to comply with NPDES permit effluent limitations, conditions and stipulations . . . ." *Id.*

3

[f]ederal Water Pollution Control Act (33 U.S.C.[] §§ 1251-1387), specifically for restoration, protection and maintenance of the water quality of the Chesapeake Bay.

(4) Credits and offsets may only be used for comparable pollutants, unless otherwise authorized by [DEP]. For example, nitrogen credits or offsets may only be used to meet nitrogen effluent limits.

(5) The use of credits and offsets must comply with legal requirements under applicable laws and regulations, including the requirements of this section.

(6) Credits and offsets may not be used to comply with technology-based effluent limits, except as expressly authorized under [f]ederal regulations administered by the EPA.

25 Pa. Code § 96.8(b). Nutrient credit trading may not be used to meet either local TMDLs for individual waters of the Commonwealth or local water quality standards in an individual NPDES permit. 25 Pa. Code § 96.8(h)(2), (i).

DEP issued the Permit to Keystone on September 27, 2018.[4] The Permit expressly authorized Keystone

to discharge [treated wastewater] from a facility known as Keystone Protein Fredericksburg, located in Bethel Township, Lebanon County, to Elizabeth Run, unnamed tributary to Beach Run and Little Swatara Creek . . . in accordance with effluent limitations, monitoring requirements and other conditions set forth in [the provisions of the Permit].

R.R. at 94a. Little Swatara Creek is a tributary to Swatara Creek, which flows into the Susquehanna River and eventually ends in the Chesapeake Bay. The treated

---

[4] DEP issued an initial NPDES permit to Keystone on October 26, 2017, and an amended NPDES permit on September 27, 2018. FWW appealed both the initial permit and the amended permit to the Board, which consolidated the appeals for disposition. Consequently, we refer to Keystone's initial and amended NPDES permits together herein as "Permit."

4

wastewater from Keystone's poultry processing facility is expected to contain both nitrogen and phosphorus.[5]

The Permit contains provisions expressly authorizing Keystone to engage in nutrient credit trading to meet the "cap loads" for net total nitrogen and net total phosphorus under DEP's regulations. R.R. at 119a. The Permit also contains independent mass and concentration effluent limits for total nitrogen and total phosphorus for the discharge point to Little Swatara Creek and outlines the specific process that Keystone must follow to trade nutrient credits. *Id.*

On November 7, 2018, FWW appealed the Permit to the Board. Thereafter, both DEP and Keystone filed Motions for Summary Judgment. In its Motion for Summary Judgment, Keystone challenged, among other things, FWW's standing to appeal DEP's issuance of the Permit. The Board denied both Motions for Summary Judgment on August 9, 2019, concluding, based on the existing record, that FWW had standing to appeal the issuance of the Permit. R.R. at 421a. The Board concluded:

> [FWW's members] are concerned that excessive nutrient discharges into Little Swatara Creek will give rise to (1) health risks from recreating in polluted water, (2) damages to the Swatara Creek ecosystem, its aquatic life, and wildlife, and, consequently, (3) diminished enjoyment and curtailment of their recreational and aesthetic activities. The Board has

---

[5] In its August 9, 2019 Opinion denying DEP's and Keystone's Motions for Summary Judgment, the Board explained:

> The wastewater [from Keystone's facility] may contain, among other parameters, nitrogen and phosphorus. Nitrogen and phosphorus are subject to mass and concentration limits spelled out [in] the [P]ermit. Nitrogen and phosphorus are nutrients. Too much nitrogen and phosphorus in the water can cause algae to grow faster than ecosystems can handle. The [P]ermit limits for nitrogen and phosphorus . . . are designed to require Keystone to employ the proper technology to treat its waste, as well as to protect the uses of Little Swatara Creek.

R.R. at 422a.

long held that when a challenged activity has the legitimately perceived potential to affect one's health or damage an environmental resource, such that it diminishes enjoyment of that resource, the activity is averse to an individual's use of an area.

Because [FWW's] members have articulated specific reasons for their concerns, their concerns are more than purely speculative under Board precedent.

*Id.* at 432a-33a.

In lieu of a hearing on the merits, on December 9, 2019, the parties submitted Stipulated Facts and Joint Exhibits (Joint Stipulation) to the Board.[6]  The Joint Stipulation stated that it "constitute[d] the entire record of the case before the Board" and that "[n]o additional evidence shall be used or submitted by the parties in litigating this matter."  R.R. at 1a.  In the Joint Stipulation, the parties agreed to the following facts:

1.      In the August 19, 2017 issue of the Pennsylvania Bulletin, . . . DEP published notice of the Draft NPDES Permit No. PA0266345 for Keystone . . . .

2.      On October 26, 2017, DEP issued the final version of Permit No. PA0266345.

3       [FWW] filed an appeal of the October 2017 Permit version on December 4, 2017.

4.      In the August 4, 2018 issue of the Pennsylvania Bulletin, DEP published notice of a revised draft Amendment No. 1 to the [P]ermit for Keystone . . . .

---

[6] The Board's regulations provide: "A hearing need not be held . . . if [the] parties stipulate [to] the essential facts or agree to submit direct and rebuttal testimony or documentary evidence in affidavit form (sworn or affirmed on personal knowledge) or by deposition."  25 Pa. Code § 1021.112(a).

5. On September 27, 2018, DEP issued the final revised Permit No. PA0266345 and response to comments.

6. FWW timely filed an appeal of DEP's issuance of the [P]ermit on November 7, 2018.

7. There have been no discharges under the Permit to date and no nutrient trading has been conducted pursuant to the Permit.

8. On June 13, 2018, depositions were taken of Ms. Debra Ryan and Ms. Ann Pinca, both of whom [FWW] identified as members of its organization.[7]

9. [FWW] is a national membership organization that advocates for clean water and the public control of water resources, including oceans, rivers, and ground water.

10. Ms. . . . Ryan, a member of [FWW], lives at 7423 Green Hill Road in Harrisburg, Pennsylvania.

11. Ms. Ryan's home is located approximately 19 miles from the point at which wastewater discharges are authorized under the Permit, or an approximately 22[-]mile drive.

12 Ms. Ryan first learned about this appeal a few weeks before her deposition was taken when she received a call from an employee of [FWW].

13. Over the years, Ms. Ryan and her children have spent time kayaking, fishing, and taking their dogs along portions of the Swatara Creek in Swatara State Park and Lickdale Campground.

14. Ms. Ryan is concerned that the discharge authorized by the Permit could affect her use of Swatara Creek by disrupting the water levels and affecting wildlife.

---

[7] Ms. Ryan has been a member of FWW since October 2016. R.R. at 165a. Ms. Pinca has been a member since November 2016. *Id.* at 156a.

15. Ms. Ryan has not spoken with any experts or others, aside from employees of [FWW] and counsel, to determine if discharges under the [P]ermit are likely to change the water levels in the Little Swatara Creek or adversely affect wildlife in or around the Little Swatara Creek.

16. As of June 13, 2018, Ms. Ryan had recently hiked along portions of the Swatara Creek in or around Hershey, P[ennsylvania], which she referred to as "Boathouse" and "Cocoa Kayaking."

17. According to Ms. Ryan, the "Boathouse" is located northwest of Hersheypark Stadium in or around Union Deposit, near where Route 39 crosses the Swatara Creek.

18. Between 2001 and 2013, Ms. Ryan kayaked on several occasions near the "Boathouse" location and near Harper's Tavern in East Hanover Township.

19. As of June 13, 2018, Ms. Ryan's last time kayaking along the Swatara Creek was "about five years ago."

20. Ms. . . . Pinca, a member of [FWW], lives at 2154 Cloverfield Drive in Lebanon, Pennsylvania.

21. Ms. Pinca is concerned that the discharges permitted under the Permit will adversely affect wildlife, bird watching and kayaking on the Swatara Creek.

*Id.* at 1a-3a.

After submitting the Joint Stipulation, the parties filed briefs with the Board, setting forth proposed findings of fact and conclusions of law based on the agreed-upon record. In their briefs, DEP and Keystone again raised the issue of FWW's standing to maintain its appeal.

The Board issued its Adjudication on May 21, 2020. The Board first found that FWW demonstrated that it has standing as the representative of its members to

challenge DEP's issuance of the Permit.  Bd. Adjudication, 5/21/20, at 19.  The Board concluded:

> *Based on the extensive evidence in the record of Ms. Ryan['s] and Ms.  Pinca's use and enjoyment of the area around Swatara Creek and Little Swatara Creek, there is no question that they, and therefore [FWW], have a substantial interest in this matter.*  In  addition, Ms. Ryan and Ms. Pinca have credibly testified that due to the issuance of the [P]ermit, they expect that they will enjoy their Swatara Creek activities less and it may cause them to curtail their activities altogether.  Thus, *their interest is direct and immediate. . . .*
>
> . . . .
>
> Ms. Ryan['s] and Ms. Pinca's concerns extend to Keystone's ability to engage in nutrient credit trading and how it will affect the discharge into Little Swatara Creek.  Ms. Ryan believes that if [DEP] were to remove the nutrient trading provisions of the [P]ermit, Keystone would be subject to more protective annual limits on nitrogen and phosphor[]us discharges, which would significantly reduce her concern over the impact of the discharges on her kayaking and  recreational  activities. Likewise, Ms. Pinca states that if the [P]ermit had included firm limits for nitrogen and phosphorus, rather than allowing Keystone to engage in nutrient trading, she would know more about the overall pollution coming downstream from the facility, which would significantly reduce her concerns about the discharge. *There is no question that Ms. Ryan and Ms. Pinca, and therefore [FWW], have more than met their burden of demonstrating that they have standing to challenge the issuance of Keystone's permit authorizing a discharge in the waters in which they engage in recreational activities.*

*Id.* at 10-12 (emphasis added) (internal citations omitted).

The Board also rejected DEP's and Keystone's contentions that because FWW abandoned its claim regarding the inadequacy of local water-quality-based effluent limits, and instead focused solely on the legality of the nutrient credit trading provisions in the Permit, FWW could not establish standing.  The Board determined:

9

The challenged activity in this case is [DEP's] issuance of the permit and amended permit authorizing a discharge to Little Swatara Creek. *Whether [FWW] has standing to challenge that action is not dependent on its objections to that action but on whether its members, Ms. Ryan and Ms. Pinca, have a substantial, direct and immediate interest in the action itself. We have already found that they clearly do*, both on the record before us and in the [prior] opinion denying Keystone's previous challenge to standing.

*Id.* at 16-17 (emphasis added). In so holding, the Board emphasized that FWW's "standing is not determined by the objections it chooses to pursue in its appeal, but *by the activity that it is appealing, i.e., [DEP's] issuance of [the Permit] authorizing a discharge [of treated wastewater in]to Little Swatara Creek*." *Id.* at 18 (emphasis added).

With regard to the merits of the appeal, the Board concluded DEP was authorized under both federal and state law to issue the Permit, including the nutrient credit trading provisions. The Board explained its reasoning as follows:

[T]he Clean Water Act does not prohibit states from adopting water quality protection programs that incorporate the use of nutrient trading. Nor has [FWW] persuaded us that Pennsylvania's NPDES program is any less stringent than the federal program. In our view, Pennsylvania's nutrient trading regulations are consistent with federal law. In light of this finding, we apply Pennsylvania law in determining whether to uphold the [P]ermit and, specifically, the nutrient trading provisions of the [P]ermit. *Because Pennsylvania has duly promulgated regulations authorizing nutrient trading, which we believe are consistent with the goals of the Clean Water Act, we find that [DEP's] issuance of the [Permit] allowing Keystone to engage in nutrient trading was an appropriate exercise of its authority*.

*Id.* at 27 (emphasis added). Therefore, the Board dismissed FWW's appeal on the merits.

One member of the Board, Judge Bernard A. Labuskes, Jr., authored a concurring opinion,[8] in which he "disagree[d] that [FWW] has demonstrated by a preponderance of the evidence in the stipulated record that it has standing." *Id.* at 32. In particular, Judge Labuskes opined that FWW "made no showing with record evidence that [Ms.] Ryan[']s and [Ms.] Pinca's use of the area will be affected by Keystone's discharges under the . . . [P]ermit." *Id.* at 33. Judge Labuskes explained:

> [FWW's] sole objections to the [P]ermit concern nutrient credit trading and why it believes trading is unlawful under the federal Clean Water Act. It presents legal arguments but nothing on the real-world effect of credit trading on water quality, whether at Little Swatara Creek, Swatara Creek, or the Chesapeake Bay. [FWW] has not pointed to *any* record evidence that any provision of the [P]ermit, or any aspect o[f] Keystone's proposed activity, poses any threat whatsoever to [Ms.] Ryan[']s and [Ms.] Pinca's recreational use of the Swatara Creek, or that Keystone's facility will have any impact at all on the water quality that provides the basis for [Ms.] Ryan[']s and [Ms.] Pinca's use and enjoyment.

*Id.* at 33-34 (emphasis in original). Consequently, Judge Labuskes concurred in the result reached by the Board's majority.

On June 18, 2020, FWW filed its Petition for Review with this Court,[9] asserting that the Board erred in dismissing its appeal. Specifically, FWW asserts that DEP erred in issuing the Permit "because nutrient pollution trading is illegal" under the Clean Water Act. FWW Pet. for Rev. ¶ 5. According to FWW, the Permit impermissibly

---

[8] Four members of the five-member Board joined the majority opinion. Judge Labuskes concurred in the result only.

[9] Our scope of review of the Board's Adjudication "is limited to determining whether the [Board] committed an error of law, [whether it] violated constitutional rights, or whether its material findings of fact are supported by substantial evidence." *Sunoco Partners Mktg. & Terminals, L.P. v. Clean Air Council*, 219 A.3d 280, 286 n.17 (Pa. Cmwlth. 2019). As to questions of law, our standard of review is *de novo* and our scope of review is plenary. *Id.*

11

allows Keystone "to engage in nutrient pollution trading as an alternative to meeting the pollution load limits [that] Pennsylvania has assigned it to achieve Chesapeake Bay TMDL limits." *Id.* FWW asks this Court to reverse the Board's Adjudication and remand this matter to DEP to issue a new permit to Keystone without the nutrient credit trading provisions. *Id.* ¶ 6.

On July 1, 2020, DEP filed a Cross Petition for Review with this Court, wherein it challenges "only that portion of the Board's Adjudication that found FWW had standing to maintain its appeal" before the Board. DEP Pet. for Rev. ¶ 4. DEP asserts that the Board erred in concluding that FWW had representational standing to challenge the issuance of the Permit. Specifically, DEP asserts that FWW failed to establish: any potential harm to its members' use and enjoyment of Little Swatara Creek or Swatara Creek as a result of the nutrient credit trading provisions; any potential harm to Little Swatara Creek, Swatara Creek, or the Chesapeake Bay as a result of the nutrient credit trading provisions; or that its members had a substantial, direct, and immediate interest in the outcome of the appeal before the Board. *Id.* ¶¶ 6-9.

On July 2, 2020, Keystone also filed a Cross Petition for Review, asserting that FWW lacked standing to appeal the issuance of the Permit. Keystone Pet. for Rev. ¶ 4. Like DEP, Keystone avers that FWW failed to establish an "objectively reasonable threat that any of its members would be harmed" by the nutrient credit trading provisions of the Permit. *Id.* ¶ 6. Keystone further avers that FWW produced no evidence of "any actual or potential harm to the waters . . . that would receive the discharges authorized by the nutrient credit trading provisions" of the Permit. *Id.* ¶ 7. Finally, Keystone avers that FWW failed to establish that its members had a substantial, direct, and immediate interest in the outcome of the appeal before the Board. *Id.* ¶ 8.

12

According to Keystone, it "does not appeal any other aspects" of the Board's Adjudication. *Id.* ¶ 4 (emphasis in original).

Both DEP and Keystone ask this Court to reverse the Board's finding that FWW had standing to appeal the issuance of the Permit. DEP Pet. for Rev. ¶ 10; Keystone Pet. for Rev. ¶ 10.

<u>Analysis</u>

### 1. DEP's and Keystone's Cross-Appeals[10]

In their Cross Petitions for Review, DEP and Keystone assert that the Board erred in concluding that FWW had standing to appeal DEP's issuance of the Permit. FWW claims representational standing to challenge the Permit based on the interests of two of its members, Ms. Pinca and Ms. Ryan. According to DEP and Keystone, however, Keystone is required to meet the local effluent limits for Little Swatara Creek at all times, regardless of whether it participates in nutrient credit trading, and FWW does not challenge the sufficiency of those local water protections. Thus, DEP and Keystone contend that FWW failed to establish any connection between the interest of

---

[10] Although not designated as such, DEP's and Keystone's cross-appeals appear to be protective cross-appeals, because they succeeded in obtaining a dismissal of FWW's appeal before the Board and, thus, are not aggrieved. *See ACS Enters., Inc. v. Norristown Borough Zoning Hearing Bd.*, 659 A.2d 651, 653 (Pa. Cmwlth. 1995) ("[A] party [that] has prevailed in the proceeding below is not an aggrieved party and consequently has no standing to appeal to this Court."); *Burchanowski v. Cnty. of Lycoming*, 378 A.2d 1025, 1027 (Pa. Cmwlth. 1977) ("When one issue in a case is decided against a party, but the party prevails on the other issues and wins the case in chief, the party cannot claim to have been 'aggrieved' by the decision; he therefore lacks standing to appeal the single issue decided against him.").

However, FWW does not ask this Court to quash or dismiss either cross-appeal for lack of standing, nor does FWW challenge DEP's or Keystone's standing to appeal in its principal brief or reply brief filed with this Court. Because this Court may not raise standing *sua sponte*, we will not quash or dismiss DEP's and Keystone's cross-appeals for lack of standing. *Accord In re Smith*, 231 A.3d 59, 60 n.1 (Pa. Cmwlth.) (explaining that standing to appeal cannot be raised by this Court *sua sponte*, so a party's failure to raise standing either in a motion to quash or dismiss or in its appellate brief results in waiver of the issue), *appeal denied*, 242 A.3d 1248 (Pa. 2020).

13

its members and the legal challenge at issue so as to confer standing on FWW. We disagree.

The Pennsylvania Supreme Court has outlined the requirements for standing when a party challenges an administrative agency action as follows:

> [B]y virtue of Section 702 of the Administrative Agency Law, [2 Pa. C.S. § 702,] neither party status nor traditional aggrievement is necessary to challenge actions of an administrative agency. Rather, *standing to appeal administrative decisions extends to "persons," including non-parties, who have a "direct interest" in the subject matter*, as distinguished from a "direct, immediate, and substantial" interest. *A direct interest requires a showing that the matter complained of caused harm to the person's interest.* Although not the full equivalent of "direct, immediate, and substantial," the direct interest requirement retains the function of differentiating material interests that are discrete to some person or limited class of persons from more diffuse ones that are common among the citizenry.

*Citizens Against Gambling Subsidies, Inc. v. Pa. Gaming Control Bd.*, 916 A.2d 624, 628 (Pa. 2007) (internal citations omitted) (emphasis added); *see also* Section 7(a) of The Clean Streams Law, 35 P.S. § 691.7(a) ("Any person or municipality having an interest which is or may be adversely affected by any action of [DEP] under this act shall have the right to appeal such action to the . . . Board.").[11] Moreover, an association has standing as the representative of its members, even in the absence of injury to itself, if it alleges that at least one of its members is suffering immediate or threatened injury because of the challenged action. *Robinson Twp. v. Com.*, 83 A.3d 901, 922 (Pa. 2013).

In *Funk v. Wolf*, 144 A.3d 228 (Pa. Cmwlth. 2016), *affirmed*, 158 A.3d 642 (Pa. 2017), this Court, applying United States Supreme Court precedent, explained the requirements for associational standing in an environmental case as follows:

---

[11] Section 7 of the Clean Streams Law was added by the Act of July 31, 1970, P.L. 653.

14

In *Friends of the Earth*[, *Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167 (2000)], the United States Supreme Court addressed a citizen suit authorized by Section 505(a) of the federal Clean Water Act[, 33 U.S.C. § 1365(a)]. *The petitioner alleged that by discharging pollutants into a waterway, the defendant violated the Clean Water Act and the conditions of its discharge permit issued by the state department of health. The petitioner averred that it had standing as an association because some of its members have standing.* One of its members alleged that he lived close to the waterway and that it smelled polluted as he drove by. The member also alleged that he liked to fish, camp, swim, and picnic by the river, and that he would not do so now due to the discharges. Other members alleged that they liked to walk, birdwatch, and hike near the waterway, but would no longer do so. *The [Supreme] Court held that the association had standing based on the averments of its individual members.* According to the [Supreme] Court[:]

> *We have held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity.* . . . [T]he affidavits and testimony presented by [plaintiff] in this case assert that [defendant's] discharges, and *the affiant members' reasonable concerns about the effects of those discharges*, directly affected those affiants' recreational, aesthetic, and economic interests. These submissions present dispositively more than the mere general averments and conclusory allegations . . . .

*Id.* at 244-45 (emphasis added) (quoting *Friends of the Earth*, 528 U.S. at 183-84) (footnote and internal citations omitted). Thus, to establish standing, FWW must show that Ms. Ryan and Ms. Pinca use the area affected by the Permit and have reasonable concerns that their use and enjoyment of the area will be adversely affected by the proposed discharge activity. *See Robinson Twp.*, 83 A.3d at 921 (finding that an association had standing based on, among other things, "the deleterious effects of industrial activities close to its members' homes, including effects on their health and their ability to enjoy natural beauty, environmental resources, and recreational

15

activities in the Delaware River corridor, such as fishing, boating, swimming, and bird-watching").

Here, both Ms. Ryan and Ms. Pinca testified in detail regarding their recreational use and enjoyment of Swatara Creek and Little Swatara Creek, the point of Keystone's proposed discharge under the Permit. The Board, relying on the facts and evidence in the stipulated record, summarized their testimony as follows.

Ms. Ryan has lived near Swatara Creek most of her life and frequently visits the creek with her husband and children. Bd. Adjudication, 5/21/20, at 9. When her children were young, she and her family used to "wade in the water, play with [their] dogs, and fish along the banks." *Id.* Now that her children are grown, she enjoys hiking with them along the creek paths and picnicking with her grandchildren near the water. *Id.* Ms. Ryan has also kayaked many times along various stretches of the creek. *Id.* Ms. Ryan and her children have spent time kayaking, fishing, and walking their dogs along portions of the creek. *Id.*

Ms. Pinca lives a few miles from Swatara Creek and has a long history of advocating for its protection. *Id.* She testified that her advocacy efforts are motivated in part by her personal use and enjoyment of Swatara Creek. *Id.* Ms. Pinca and her husband purchased kayaks a few years ago to kayak on the creek and other local waterways. *Id.* During the summers of 2016 and 2017, they kayaked three or four times, and in July 2018 they re-purchased permits that allowed them to kayak on the creek for two years. *Id.* Ms. Pinca and her husband kayak in the area near the convergence of Swatara Creek and Little Swatara Creek. *Id.* at 9-10. Ms. Pinca testified that while kayaking, she and her husband often have direct contact with the water. *Id.* at 10. Ms. Pinca likes to wade in the water and look for animals and aquatic life while kayaking. *Id.* Ms. Pinca is also a bird watcher. *Id.* She has seen herons on

the creek and eagles perched in trees adjacent to the stream. *Id.* She once observed a bald eagle's nest along Little Swatara Creek, downstream from the Keystone discharge point. *Id.* Ms. Pinca has also seen robins, blue jays, and squirrels in the area. *Id.*

Ms. Ryan and Ms. Pinca also expressed their concerns regarding the discharge authorized by the Permit. Ms. Pinca is concerned that "increased pollution from [Keystone's] facility will degrade the ecosystem, deplete the water's oxygen levels, and harm fish and other wildlife." *Id.* at 11. She testified that the proposed discharge from Keystone's facility will diminish her enjoyment of kayaking and birdwatching near Little Swatara Creek and areas downstream. *Id.* Similarly, Ms. Ryan is concerned that the proposed discharge will harm water quality in the areas where she enjoys kayaking and spending time with her family. *Id.* She will not be able to hike near the creek with her sons' dogs for fear of them drinking polluted water. *Id.* Ms. Ryan is particularly concerned that kayaking in polluted water could have negative health effects on her husband, who is immunosuppressed.

Based on the evidence of record demonstrating Ms. Ryan's and Ms. Pinca's use and enjoyment of Swatara Creek and Little Swatara Creek, we conclude that FWW has established a direct interest in DEP's issuance of the Permit so as to confer standing. *See Friends of the Earth*, 528 U.S. at 183-84; *see also Wm. Penn Parking Garage, Inc. v. City of Pittsburgh*, 346 A.2d 269, 281 n.20 (Pa. 1975) ("Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process.").

DEP and Keystone also argue that because FWW does not specifically challenge the Permit's impact on *local* water quality, it lacks standing to pursue its appeal. DEP

and Keystone contend that nutrient credit trading applies only to the Chesapeake Bay, not to Swatara Creek or Little Swatara Creek, and because the record contains no evidence that Ms. Pinca and Ms. Ryan recreate in or near the Chesapeake Bay, they do not have a direct or substantial interest in this matter. We disagree.

The challenged activity in this case is DEP's issuance of the Permit, which expressly authorizes the discharge of treated wastewater into Little Swatara Creek, a tributary of the Chesapeake Bay. Contrary to DEP's and Keystone's assertion, FWW's standing does not depend on its particular objections to the Permit, but on whether its members, Ms. Ryan and Ms. Pinca, have a direct interest in the action authorized by the Permit. As the Board correctly explained:

> [A]lthough the Department and Keystone contend that [FWW] is merely challenging the "concept" or "policy" of nutrient trading, this ignores the real world impact of the trading provision on [FWW's] members, Ms. Ryan and Ms. Pinca. *If nutrient trading is allowed for purposes of meeting the Chesapeake Bay TMDL, this impacts how much of each pollutant Keystone can emit at the source of its discharge, Little Swatara Creek. Any provision of the [P]ermit[] that impacts the Chesapeake Bay also has the potential to impact the entire Swatara Creek watershed. . . .*
>
> [FWW's] appeal is not some abstract challenge to the general concept of nutrient trading. *Rather, it is a challenge to a very specific provision of a [DEP]-issued [P]ermit that authorizes discharges to a very real stream where [Ms.] Ryan and [Ms.] Pinca spend time and engage in recreational activities. Once [DEP] makes a decision to issue a permit, then the permit and all its provisions are subject to challenge by anyone who has a substantial interest in the matter, including those who live and engage in activities in the area impacted by the permit*. This is the very essence of standing.

Bd. Adjudication, 5/21/20, at 18-19 (emphasis added). We find no error in the Board's decision.

18

Therefore, we conclude that FWW, as the representative of its members, Ms. Ryan and Ms. Pinca, has standing to maintain this action.

## 2. FWW's Appeal

FWW asserts that the Board erred in concluding that the Permit's provisions authorizing Keystone to engage in nutrient credit trading do not violate federal or state law. FWW contends that because the Clean Water Act and its implementing regulations do not explicitly authorize the use of nutrient credit trading to satisfy NPDES effluent limitations, such trading is prohibited under the Clean Water Act. In response, DEP and Keystone assert that: the plain language of the Clean Water Act does not prohibit nutrient credit trading; the EPA has consistently supported and approved the practice of nutrient credit trading; and Pennsylvania's nutrient credit trading program provides more stringent water quality protections than the Clean Water Act and, as such, is consistent with the statute's purpose.[12]

---

[12] The following organizations have filed an *Amicus Curiae* Brief in support of DEP's and Keystone's legal position in this appeal: the National Association of Clean Water Agencies, the Virginia Nutrient Credit Exchange Association, the Virginia Association of Municipal Wastewater Agencies, the Virginia Municipal Stormwater Association, the Maryland Association of Municipal Wastewater Agencies, the Maryland Municipal Stormwater Association, the North Carolina Water Quality Association, the South Carolina Water Quality Association, the West Virginia Municipal Water Quality Association, and the Association of Missouri Cleanwater Agencies (together, Municipal Associations). The Municipal Associations assert:

> Like [Keystone], the Municipal Associations' members hold [NPDES] permits authorizing the discharge of wastewater and/or stormwater. Although many elements of those permits vary from [s]tate to [s]tate, *the common thread is that they must be consistent with all applicable requirements and limitations of the federal Clean Water Act. The [EPA] and every court to consider the issue to date have found water quality trading to be an effective permit compliance tool that is consistent with the Clean Water Act.* [The] Municipal Associations have a strong interest in defending that precedent, which is directly challenged in this appeal by [FWW].

*Amicus Curiae* Br. at 1-2 (emphasis added).

## a. The Clean Water Act

The United States Supreme Court has recognized that "the Clean Water Act vests in the EPA and the [s]tates broad authority to develop long-range, area-wide programs to alleviate and eliminate existing pollution." *Arkansas v. Oklahoma*, 503 U.S. 91, 108 (1992). The Clean Water Act gives the states discretion as to how to accomplish the goals of the Act, including implementation of TMDLs.

The Clean Water Act prohibits any discharge from a "point source," such as Keystone, unless that discharge is in compliance with an NPDES permit. 33 U.S.C. § 1311(a); 40 C.F.R. § 122.1(b)(1). Any NPDES permit issued must include effluent limitations in compliance with the Clean Water Act. 33 U.S.C. § 1311(b)(1)(A); 40 C.F.R. § 125.3(a). Section 302(a) of the Clean Water Act requires the imposition of water-quality-based effluent limitations when the technology-based effluent limitations applicable to a point source will be insufficient to achieve and maintain water quality standards. 33 U.S.C. § 1312(a).

While the Clean Water Act empowers the Administrator of the EPA to implement the NPDES program, it also allows the EPA to delegate that authority to states whose permitting programs meet minimum federal standards. 33 U.S.C. § 1342(b); *see generally* 40 C.F.R. § 123.1.

In 1991, the EPA and the Commonwealth of Pennsylvania entered a Memorandum of Agreement, wherein the EPA delegated authority over its NPDES program to DEP's predecessor. R.R. at 406a-20a. The Memorandum stated that "[DEP] will administer the NPDES program in accordance with Section 402 of the [f]ederal Clean Water Act" and applicable federal regulations. *Id.* at 406a.

### b. Pennsylvania's Nutrient Credit Trading Program

As discussed earlier, in 2010, DEP adopted a nutrient credit trading program to assist Pennsylvania in meeting the Chesapeake Bay TMDL for pollutants. A nutrient "credit" is "[t]he tradable unit of compliance that corresponds with a unit of reduction of a pollutant as recognized by [DEP] which, when certified, verified and registered, may be used to comply with NPDES permit effluent limitations." 25 Pa. Code § 96.8(a). Permittees may use credits to meet effluent limits for nutrients and sediment contained in NPDES permits that are based on the water quality standards established under the Clean Water Act, "specifically for restoration, protection and maintenance of the water quality of the Chesapeake Bay." *Id.* § 96.8(b)(3).

Credits generated may not be applied to meet permit effluent limitations until certified by DEP. *Id.* § 96.8(e)(1). Credits may only be generated from pollutant activities that have been certified, verified, and registered, *id.* § 96.8(b)(2), and may only be used for comparable pollutants unless otherwise authorized by DEP, *id.* § 96.8(b)(4).

The nutrient credit trading program ensures that credits generated adequately account for uncertainty, water quality, reduction failures, and other considerations through the application of a "trading ratio," which is "[a] ratio applied to adjust a pollutant reduction when calculating credits for a pollutant reduction activity." *Id.* § 96.8(a). The trading ratio also includes a delivery ratio, which compensates for the natural attenuation of a pollutant before it reaches a defined compliance point. *Id.*

### c. Nutrient Credit Trading Provisions of the Permit

FWW does not dispute that the Permit at issue complies with Pennsylvania's nutrient credit trading regulations. Rather, FWW asserts that the nutrient credit trading provisions of the Permit fail to comply with the Clean Water Act. FWW relies on 25

21

Pa. Code § 92a.3(a) (emphasis added), which states: "In the event of a conflict between a [f]ederal regulatory provision and a regulation of the Commonwealth, the provision expressly set out in this chapter shall be applied *unless the [f]ederal provision is more stringent*." FWW argues that because neither the Clean Water Act nor its regulations expressly authorize nutrient credit trading, the federal regulations are "more stringent" than Pennsylvania's and, therefore, DEP was prohibited from issuing the Permit allowing Keystone to engage in nutrient credit trading.

FWW contends that allowing Keystone to "trade" pollutant credits to meet the Chesapeake Bay TMDL is inconsistent with the plain language of the Clean Water Act. As FWW explains, NPDES permits primarily operate through the imposition of effluent limitations, which restrict the amount of pollutants that a permittee may discharge. FWW Br. at 14. The Clean Water Act defines "effluent limitation" as "any restriction established by a State or the Administrator [of the EPA] on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are *discharged from point sources. . . .*" 33 U.S.C. § 1362(11) (emphasis added). Thus, FWW argues that effluent limitations apply to a point source's own discharge, and must be met by controlling pollution *from the point source itself*. According to FWW,

> [g]iven that the text of the [Clean Water Act] and [its] regulations are focused on controlling pollutant discharges from point sources like Keystone, it is improper to infer that the [Clean Water Act] allows a practice like pollution trading, in which a point source can discharge any amount of pollution yet can buy its way into "compliance" with applicable effluent limits via purchasing pollution credits to meet a "net" pollution value.

FWW Br. at 17-18.

However, the Permit in this case contains effluent limitations meeting the requirements of Section 302 of the Clean Water Act, 33 U.S.C. § 1312, as well as local

22

limits for several pollutants, including total nitrogen and total phosphorus. R.R. at 13a, 94a, 99a. The Permit specifically provides:

> Where effluent limitations for [total nitrogen] and/or [total phosphorus] are established in Part A of the [P]ermit for reasons other than the Cap Load assigned for protection of the Chesapeake Bay ("local nutrient limits"), the permittee may purchase and apply credits for compliance with the Cap Load(s) *only when the permittee has demonstrated that local nutrient limits have been achieved.*

R.R. at 119a (emphasis added). In other words, the Permit requires Keystone to comply with local limits for total nitrogen and total phosphorus *before* it may engage in any nutrient trading to satisfy the Chesapeake Bay TMDL. *See* 25 Pa. Code § 96.8(h)(2), (i). FWW does not dispute that the local effluent limits outlined in pages 2 and 3 of the Permit, *see* R.R. at 98a-99a, are sufficient to protect Little Swatara Creek. Therefore, contrary to FWW's assertion, the Permit is consistent with the Clean Water Act's mandate that a point source must meet its own effluent limitations in order to comply with the Clean Water Act.

Moreover, while the Clean Water Act does not explicitly address nutrient credit trading, the EPA has consistently interpreted the Clean Water Act to permit nutrient trading as a means to satisfy NPDES effluent limitations, both in its own policy documents and in the Chesapeake Bay TMDL itself. As FWW concedes in its brief:

> FWW does not dispute that [the] EPA has made statements in support of water quality trading in non-binding guidance documents and the Chesapeake Bay TMDL. *See, e.g.*, *Food & Water Watch*[] [*v. U.S. Env't Prot. Agency*, 5 F. Supp. 3d 62, 70 (D.D.C. 2013)] (noting that [the] EPA has issued water quality trading guidance in the form of a policy document and toolkit, and that [the] EPA addresses trading in Section 10 of the [Chesapeake] Bay TMDL)[] . . . .

FWW Br. at 28; *see* R.R. at 398a-405a. FWW contends, however, that while the EPA has issued policy statements supporting the concept of nutrient trading, it has never promulgated a regulation authorizing or approving nutrient trading under the Clean Water Act.

While it is true that no such federal regulation exists, the Board found, and we agree, that nutrient credit trading is clearly "supported by the EPA as a means of achieving water quality improvements" under the Clean Water Act. Bd. Adjudication, 5/21/20, at 25. In the Chesapeake Bay TMDL, the EPA expressly recognized that states may use nutrient trading to comply with the TMDL's wasteload allocations. The Chesapeake Bay TMDL states, in pertinent part:

### 10.2 WATER QUALITY TRADING

[The] EPA recognizes that a number of [Chesapeake] Bay jurisdictions already are implementing water quality trading programs. *[The] EPA supports implementation of the [Chesapeake] Bay TMDL through such programs, as long as they are established and implemented in a manner consistent with the [Clean Water Act], its implementing regulations, and EPA's 2003 Water Quality Trading Policy . . . and 2007 Water Quality Trading Toolkit for NPDES Permit Writers . . . .* An assumption of this TMDL is that *trades may occur between sources contributing pollutant loadings to the same or different [Chesapeake] Bay segments*, provided such trades do not cause or contribute to an exceedance of [water quality standards] in either [the] receiving segment or anywhere else in the [Chesapeake] Bay [W]atershed. . . .

R.R. at 400a (emphasis added) (footnotes omitted). As explained in the TMDL, the EPA issued final policy documents in 2003 and 2007, encouraging the use of nutrient credit trading and providing guidance to states on how to use nutrient credit trading in NPDES permitting. *See id.*; *see also Food & Water*, 5 F. Supp. 3d at 70 (summarizing the EPA's 2003 and 2007 water quality trading policies).

It is evident, based on the clear language in the Chesapeake TMDL and the EPA's own policy statements, that the EPA supports the practice of nutrient credit trading as an appropriate means of achieving the goals of the Clean Water Act. As the agency charged with administering the Clean Water Act, the EPA's apparent endorsement of nutrient credit trading should not be disturbed unless it is erroneous or frustrates the statute's legislative intent. *See Synthes USA HQ, Inc. v. Com.*, 236 A.3d 1190, 1201 (Pa. Cmwlth. 2020); *see also Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984) (holding that considerable weight should be given to an administrative department's construction of the statutory scheme it is entrusted to administer); *Nw. Youth Servs., Inc. v. Dep't of Pub. Welfare*, 66 A.3d 301, 312 (Pa. 2013) (citation omitted) ("[T]he deference owed to an agency interpretation 'will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'"). We conclude that the EPA's consistent interpretation of the Clean Water Act as supporting nutrient credit trading is entitled to deference. *See generally Am. Farm Bureau Fed'n v. U.S. Env't Prot. Agency*, 792 F.3d 281 (3d Cir. 2015) (applying *Chevron* deference to the EPA's interpretation of the Clean Water Act in the context of the Chesapeake Bay TMDL).

Federal courts have also recognized nutrient credit trading as an appropriate means of achieving the requirements of the Chesapeake Bay TMDL. For example, in *American Farm Bureau Federation v. United States Environmental Protection Agency*, 984 F. Supp. 2d 289, 327 (M.D. Pa. 2013), *affirmed*, 792 F.3d 281 (3d Cir. 2015), the plaintiffs argued that the Chesapeake Bay TMDL "creates unlawfully binding, 'locked-in' allocations." The United States District Court for the Middle District of Pennsylvania disagreed, noting that the participating states retain a degree of flexibility

to revise the wasteload allocations in the TMDL. *Id.* The district court also noted that because the EPA's regulations require that NPDES permit limits be "consistent with," but not identical to, applicable wasteload allocations, "a state may write an NPDES permit limit that is different from the [wasteload allocation in the TMDL], provided that it is consistent with the operative assumptions underlying th[at allocation]." *Id.* at 328. Finally, the district court observed:

> [T]he TMDL supports the use of water quality trading programs that permit point and non-point sources to trade pounds of phosphorus or nitrogen, provided such trading does not result in exceedances of water quality standards and is otherwise consistent with the [Clean Water Act] and applicable regulations. Thus, *the individual sources are free to trade pollution amounts without the need to revise or adjust the TMDL allocations*.

*Id.* (emphasis added).

Similarly, in an action in the United States District Court for the District of Columbia, FWW asserted that the nutrient credit trading and offset provisions in the Chesapeake Bay TMDL were "contrary to the Clean Water Act, and arbitrary and capricious in violation of the Administrative Procedure Act[, 5 U.S.C. §§ 500-596]." *Food & Water*, 5 F. Supp. 3d at 66. The district court described the TMDL implementation process as a "joint federal and state effort aimed at achieving a common objective: better water quality." *Id.* at 78. While the district court ultimately dismissed FWW's complaint on procedural grounds, it specifically recognized that, while not mandated by the EPA, "*[o]ffsets and trades are but one option in the [s]tates' arsenal for achieving*" the Clean Water Act's goals of improved water quality. *Id.* (emphasis added).[13]

---

[13] As the Municipal Associations point out in their *Amicus Curiae* brief, other federal and state courts that have addressed the practice of nutrient credit trading, either directly or in *dicta*, have not

Furthermore, Section 402(d)(2) of the Clean Water Act states: "No [NPDES] permit shall issue . . . if the Administrator [of the EPA] . . . objects in writing to the issuance of such permit as being outside the guidelines and requirements of [the Clean Water Act]." 33 U.S.C. § 1342(d)(2); *see also* 25 Pa. Code §§ 92a.91, 92a.93. Here, the Board found that the EPA Administrator reviewed the provisions of the Permit prior to its issuance and had no objections. Bd. Adjudication, 5/21/20, at 27; *see* R.R. at 399a, 401a (recognizing nutrient credit trading as a component of pollution offset programs in the Chesapeake Bay TMDL, which are subject to monitoring and review by the EPA to ensure that they are "fully consistent with the [Clean Water Act] and its implementing regulations"); *id.* at 409a-11a (providing that the EPA will review draft NPDES permits to be issued by DEP).

Finally, we agree with the Board that Pennsylvania's nutrient credit trading program provides more stringent water quality protections than the Clean Water Act. As DEP explains in its brief:

> Permitted facilities that wish to generate credits must go above and beyond their own limits in order to generate a credit for a facility like

---

questioned its legality under the Clean Water Act. *See, e.g.*, *Ohio Valley Env't Coal. v. Horinko*, 279 F. Supp. 2d 732, 776 (S.D. W. Va. 2003) (concluding that the EPA's interpretation of trading provisions for pollutant offsets in West Virginia's antidegradation implementation policies was reasonable, and the EPA's approval thereof was not arbitrary or capricious, because the "provisions [of those policies] can reasonably be read to mean that the trade must result in an improvement in water quality in the water segment where the new or expanded discharge is located"); *Md. Dep't of the Env't v. Cnty. Comm'rs*, 214 A.3d 61, 116 (Md. 2019) ("The [Maryland] Department [of the Environment] . . . had a rational basis for conditionally approving water quality trading in the Phase II MS4 general permit . . . ."), *cert. denied*, 140 S. Ct. 1265 (2020); *In re City of Annandale*, 731 N.W.2d 502, 524 (Minn. 2007) (concluding that "allowing offsets from another source in determining whether a new source will cause or contribute to the violation of water quality standards is reasonable and is consistent with the purposes and principles of the [Clean Water Act]"); *Assateague Coastkeeper v. Md. Dep't of the Env't*, 28 A.3d 178, 207 (Md. Spec. App. 2011) ("[A]llowing the consideration of pollution offsets in determining whether a discharge 'causes or contributes' to a violation of water quality standards[] is reasonable.").

Keystone to purchase. 25 Pa. Code § 96.8(d)(ii). FWW's "pay to pollute" assertion is unfounded. The reality is that credit calculation requires at least a ten percent "set aside" for DEP's reserve ratio. 25 Pa. Code § 96.8(e)(3)(v). This means that for every ten credits generated by a facility, one credit must be placed in DEP's reserve. 25 Pa. Code § 96.8(a) . . . . Additionally, DEP may require further reductions prior to certification. 25 Pa. Code § 96.8(e)(3)(vi).

The result is that for a participating permittee to use credits to meet an eligible annual effluent limitation, the permittee must find certified, verified, and registered credits generated by other facilities that directly correspond to an even greater reduction in pounds of pollutant than the number of pounds by which the permittee exceeded their effluent limitations. Accordingly, Pennsylvania's [n]utrient [c]redit [t]rading [p]rogram produces greater pollutant reductions and is therefore more protective of water quality than the standard limits contained in NPDES permits.

DEP Br. at 35-36 (some citations omitted).

In concluding that Pennsylvania's nutrient credit trading program is consistent with the aims of the Clean Water Act, the Board explained:

[T]he Clean Water Act leaves a great deal of discretion to the states as to the manner in which to accomplish the goals of the Act, including implementation of TMDLs. Pennsylvania has developed a comprehensive set of regulations aimed at restoring, protecting and maintaining the water quality of the Chesapeake Bay in accordance with the [Chesapeake] Bay TMDL. 25 Pa. Code § 96.8(b). Nutrient trading is one of many tools being used to accomplish those goals.

Moreover, Pennsylvania's nutrient trading regulations provide additional protections for water quality. . . . [The regulations] require[] a ten percent credit "set aside." 25 Pa. Code § 96.8(e)(3)(v). This means that for every ten credits generated, one must be placed in reserve. Additionally, [DEP] may impose other requirements beyond the ten percent set aside. 25 Pa. Code § 96.8(e)(3)(vi). Thus, at a minimum, for every credit generated there will be a 1/10th reduction in the nutrient load delivered to the Chesapeake Bay. *Not only is this consistent with the goals*

*of the Clean Water Act, but, in our view, provides even more stringent protection.*

Bd. Adjudication, 5/21/20, at 26 (emphasis added); *see* 40 C.F.R. § 123.1(i)(1) (providing that states participating in the NPDES program are not precluded from "[a]dopting or enforcing requirements which are more stringent or more extensive than those required" under the federal regulations). We find no error in the Board's conclusion.

## Conclusion

In sum, we conclude that FWW, as the representative of its members, Ms. Ryan and Ms. Pinca, has standing to pursue this appeal. We further conclude that DEP was authorized to allow Keystone to engage in nutrient credit trading to satisfy the requirements of the Chesapeake Bay TMDL because: (1) the plain language of the Clean Water Act does not prohibit nutrient credit trading; (2) the EPA has consistently supported the practice of nutrient credit trading; (3) the Permit complies with DEP's regulations and the Chesapeake Bay TMDL; and (4) Pennsylvania's nutrient credit trading program provides more stringent protections than the Clean Water Act and is consistent with the Act's purpose and goals. For these reasons, we conclude that the nutrient credit trading provisions in the Permit do not violate federal or state law. Accordingly, we affirm the Board's Adjudication.

_____
ELLEN CEISLER, Judge

Judge Fizzano Cannon did not participate in the decision of this case.

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Food & Water Watch, | : | |
| Petitioner | : | |
| | : | |
| v. | : | No. 565 C.D. 2020 |
| | : | |
| Department of Environmental | : | |
| Protection, | : | |
| Respondent | : | |
| | : | |
| Commonwealth of Pennsylvania, | : | |
| Department of Environmental | : | |
| Protection, | : | |
| Petitioner | : | |
| | : | |
| v. | : | No. 621 C.D. 2020 |
| | : | |
| Food & Water Watch, | : | |
| Respondent | : | |
| | : | |
| Keystone Protein Company, | : | |
| Petitioner | : | |
| | : | |
| v. | : | No. 627 C.D. 2020 |
| | : | |
| Food & Water Watch, | : | |
| Respondent | : | |

# **O R D E R**

AND NOW, this 12th day of April, 2021, the May 21, 2020 Adjudication of the Environmental Hearing Board is hereby AFFIRMED.

_____
ELLEN CEISLER, Judge